**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FRANKLIN M. BETTS, SR.,        )    CASE NO. 5:18CV1274
                      )
        Plaintiff,       )
                      )
        v.            )    MAGISTRATE JUDGE
                      )    JONATHAN D. GREENBERG
NANCY A. BERRYHILL,        )
        Acting Commissioner  )
        of Social Security,   )    **MEMORANDUM OF OPINION**
                      )    **AND ORDER**
        Defendant.     )

      Plaintiff, Franklin M. Betts, Sr. ("Plaintiff" or "Betts"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").[2]  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government. *See* General Order 2018-15. The stay
was thereafter extended pursuant to General Order 2019-1. As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I. PROCEDURAL HISTORY

In January 2015, Betts filed applications for POD, DIB, and SSI, alleging a disability onset date of January 22, 2014 and claiming he was disabled due to L2 vertebra compression fracture, depression, post-traumatic stress disorder, and early onset dementia. (Transcript ("Tr.") at 28, 218, 268.) The applications were denied initially and upon reconsideration, and Betts requested a hearing before an administrative law judge ("ALJ"). (Tr. 28.)

On May 9, 2017, an ALJ held a hearing, during which Betts, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 44-77.) On July 19, 2017, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 28-43.) The ALJ's decision became final on April 10, 2018, when the Appeals Council declined further review. (Tr. 1-7.)

On June 5, 2018, Betts filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15, 16.) Betts asserts the following assignments of error:

(1) The ALJ erred when she failed to properly consider the findings of the treating physicians regarding Betts' ability to sustain work activity due to his dementia.

(2) The ALJ erred when she failed to find that Betts satisfied the criteria of Listing 12.02.

(3) The ALJ did not properly evaluate Betts' credibility.

(4) The ALJ did not meet her burden at Step Five of the Sequential Evaluation.

(Doc. No. 13.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Betts was born in February 1967 and was forty-six (46) years-old at the time of his alleged disability onset date, making him a younger individual under social security regulations. (Tr. 36.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). He was fifty (50) years old at the time of his administrative hearing, causing him to change age categories to that of a person closely approaching advanced age. (Tr. 36.) He has at least a high school education and is able to communicate in English. (*Id.*) He has composite past relevant work as a material technician, extruder operator, and grinder. (*Id.*)

**B.    Relevant Medical Evidence[3]**

On May 8, 2013, Betts established treatment with primary care physician Jeffrey Monteith, M.D. (Tr. 535-546.) He complained of high stress, depressed mood, low energy, and sleep disturbance. (Tr. 535.) Physical examination findings were normal. (Tr. 536.) Dr. Monteith assessed obstructive sleep apnea, depression with anxiety, fatigue and malaise, hyperglycemia, and tobacco use disorder. (*Id.*) He ordered lab work and a sleep study, and prescribed Paxil. (Tr. 537, 539.)

Shortly thereafter, on May 15, 2013, Betts presented to the emergency room ("ER") after a motor vehicle accident. (Tr. 382-383.) He complained of mild headache, light lower back pain, and pain radiating down his right leg. (*Id.*) Examination revealed mild paraspinal muscular tenderness in Betts' cervical spine, diffuse lower lumbar pain, negative straight leg

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. The Court notes that, in the Facts Section of his Brief, Betts does not recite the medical evidence in chronological order but, rather, jumps randomly between treatment notes from different months and years with no apparent rhyme or reason. Plaintiff's counsel is encouraged to consider reciting the medical evidence in chronological order in future Briefs.

raise, normal reflexes, and 5/5 muscle strength. (*Id.*) ER physicians diagnosed low back strain, prescribed Percocet and Flexeril, and discharged Betts in stable condition. (Tr. 382-383, 532.)

Betts returned to Dr. Monteith on June 19, 2013 for follow up. (Tr. 532-533.) He stated his pain was improving, but continued to complain of some radiating pain. (*Id.*) Betts also reported his depression was "better," and denied concentration problems. (*Id.*) Physical examination findings were normal, including normal spinal range of motion. (*Id.*) Dr. Monteith assessed back pain and depression with anxiety, and increased Betts' Paxil dosage. (*Id.*)

On June 20, 2013, Betts presented to the ER after falling down a flight of stairs. (Tr. 374-380.) He stated he landed on his lower back and left arm, and rated his pain an 8 on a scale of 10. (Tr. 374.) Examination revealed tenderness to Betts' upper lumbar area and an abrasion to his left elbow. (*Id.*) X-rays taken that date of Betts' lumbar spine showed a mild compression fracture at L2. (Tr. 379.) Betts received an injection of Dilaudid in the ER, and was prescribed Percocet. (Tr. 374.) He was discharged in stable condition with instructions to follow up with an orthopedist. (*Id.*) Several days later, Betts presented to Dr. Monteith, with complaints of pain in his back, shoulder, cervical spine, and left arm. (Tr. 529-530.) Dr. Monteith assessed closed fracture of the lumbar vertebra without spinal cord injury, and prescribed Percocet and ibuprofen. (*Id.*) The following month, Dr. Monteith advised Betts to "hold off on return to work" until he was seen by an orthopedist. (Tr. 526-527.)

On August 5, 2013, Betts established care with orthopedist Rajiv Taliwal, M.D. (Tr. 400-401.) On examination, Dr. Taliwal noted Betts was "visibly uncomfortable," with tenderness in his mid and upper lumbar region. (Tr. 400.) Betts was able to toe and heel walk, with normal motor strength, reflexes, sensation, and pulses. (*Id.*) Dr. Taliwal concluded Betts

"has a mild injury that should go on to heal with time." (*Id*.) He encouraged Betts to avoid any heavy lifting, bending, or twisting. (*Id*.)

Betts returned to Dr. Taliwal on September 16, 2013. (Tr. 403-404.) He stated his pain continued to improve, rating it a 5 on a scale of 10. (*Id*.) Examination revealed back tenderness and stiffness, but was otherwise normal. (*Id*.) Dr. Taliwal stated "Betts continues to heal well clinically and radiographically." (*Id*.) He referred him to physical therapy. (*Id*.)

On October 24, 2013, Betts presented to Dr. Monteith with complaints of memory loss for the previous five years. (Tr. 523-524.) He reported as follows: "Issues have been progressive. Has had a speeding ticket and didn't remember the episode or paying the fine. He also forgot he has a child with another woman." (*Id*.) Physical examination findings were normal (including normal spinal range of motion), but Dr. Monteith found Betts' symptoms concerning. (*Id*.) He ordered an MRI of Betts' brain, and referred him to neurology. (*Id*.) Betts underwent the MRI on November 15, 2013, which revealed nonspecific subcortical and periventricular white matter changes that "may be seen with small vessel ischemic disease, demyelineating processes, among other etiologies." (Tr. 389-390.)

On December 9, 2013, Betts returned to Dr. Taliwal. (Tr. 406-407.) He reported "good days and bad days," and rated his back pain a 5 to 6 on a scale of 10. (*Id*.) Physical examination findings were normal, including normal range of motion, 5/5 muscle strength bilaterally, and negative straight leg raise. (*Id*.) Dr. Taliwal found Betts was "healing nicely" but stated "he may always have a little bit of discomfort." (*Id*.) He encouraged Betts to "increase activity as tolerated with no restrictions." (*Id*.)

5

Several days later, on December 11, 2013, Betts established care with neurologist Mita Deoras, M.D. (Tr. 618-620.) He reported the following symptoms:

> Memory loss began about four years ago. Short term memory loss is most pronounced. He will often forget things he had just said a few minutes ago. He has difficulty remembering people's names. Last week at a doctor's appointment, he could not recall his home address or his home telephone number. He has gotten lost when driving, often to places he has been multiple times. When he gets clues or he is told what someone's name is, he will usually remember. He is able to remember memories from childhood. As far as day to day activities, he is able to do all [activities of daily living] independently. He works as a grinder technician for Rubbermaid. He has forgotten some technical aspects of his job, but this has not caused significant decline of job performance.

(Tr. 618.) On examination, Dr. Deoras found Betts was awake, alert, and oriented to person, place and time. (Tr. 619.) Betts' cognition and general fund of knowledge were fair, and he was able to repeat sentences and recall with verbal cues. (*Id.*) Betts was also able to identify objects and follow commands. (*Id.*) His muscle tone, strength, sensation, reflexes, coordination, and gait were all normal. (*Id.*) Dr. Deoras reviewed the results of Betts' MRI, and found "mild white matter changes, no evidence of acute ischemic abnormality, [and] no significant atrophy." (Tr. 619.) Dr. Deoras ordered lab work and a neuropsychological evaluation. (Tr. 620.) She also noted that Betts "has untreated [obstructive sleep apnea] and insufficient sleep– both of which can contribute to cognitive slowing and memory loss." (*Id.*) She stressed the importance of sleep apnea treatment and encouraged Betts to use his CPAP machine. (*Id.*)

On January 30, 2014, Betts presented to the ER after slipping and falling in his driveway. (Tr. 352-353.) Examination revealed midline tenderness throughout the lumbar spine, full range of motion, normal motor strength in all four extremities, and negative straight leg raise. (*Id.*) An x-ray taken that date showed no evidence of any acute fractures or dislocations but did reveal "some decreased height of the L2 vertebrae, which appears to be

6

chronic compared to his prior x-ray." (*Id.*)  Betts was diagnosed with acute lumbar back strain, and discharged home in stable condition.  (*Id.*)

On April 18, 2014, Betts underwent a polysomnogram, which revealed obstructive sleep apnea. (Tr. 339-350.)  It was recommended that he use a CPAP machine.  (*Id.*)

Betts returned to Dr. Deoras on May 1, 2014 with continued complaints of memory loss. (Tr. 422-424.)  Dr. Deoras noted Betts had undergone a neuropsychiatric evaluation with Dr. Peluso, and recited Dr. Peluso's findings as follows:

> [H]is history, presentation, and cognitive profile are not suggestive of a frank acute underlying neurodegenerative disorder, but more so appears to be due to significant psychiatric distress including active symptoms of major depression with passive suicidal ideation, anxiety, and PTSD that have been complicated by several somatic complaints including non-compliant/untreated OSA that to this point have not yet fully resolved. His dense retrograde amnesia for past life events are believed to be largely psychogenic in nature; a finding commonly seen with patients who have past trauma/abuse and/or chronic psychiatric histories.

(Tr. 423.)  Dr. Deoras concluded that, based on the neuropsychological testing, Betts did not meet the criteria for dementia.  (Tr. 422.)  She found the "findings were most consistent with pseudo-dementia due to depression," and decided to focus treatment on Betts' depression and obstructive sleep apnea. (*Id.*)

On May 14, 2014, Betts underwent a diagnostic assessment with social worker Vickie Hanna, LISW.  (Tr. 466-485.)  He reported memory loss, concentration problems, depression, and anxiety, but indicated he was able to perform his activities of daily living.  (Tr. 477-478.) On mental status examination, Betts was well groomed and cooperative with average eye contact and activity, clear speech, euthymic mood, full affect, logical thought process, fair/good insight, and good judgment.  (Tr. 478-479.)  Ms. Vanna did note that Betts "occasionally exhibited mild - moderate memory deficits" in both short and long term memory, and showed some impairment

7

of attention/concentration. (Tr. 479.) She diagnosed adjustment disorder with mixed anxiety and depressed mood, and mental disorder, not otherwise specified. (Tr. 483.) Ms. Vanna also assessed a Global Assessment of Functioning ("GAF") of 45, indicating serious symptoms.[4] (Tr. 484.) She referred Betts for counseling and psychiatric treatment. (Tr. 482.)

On July 3, 2014, Betts presented to psychiatrist Bradly Winkhart, M.D. (Tr. 486-490.) Betts reported depressed mood, decreased interest, and poor concentration. (Tr. 486.) On examination, Dr. Winkhart found Betts was alert and oriented, friendly and cooperative, with good eye contact, clear speech, depressed mood, restricted affect, logical thought process, and good insight/judgment. (Tr. 487.) Dr. Winkhart did not note any deficits in Betts' memory or attention/concentration. (*Id.*) He diagnosed major depressive disorder, recurrent, moderate; and anxiety disorder, not otherwise specified. (Tr. 488.) Dr. Winkhart assessed a current GAF score of 45. (*Id.*) He adjusted Betts' medication, switching him from Paxil to Zoloft. (Tr. 489.)

Betts returned to Dr. Monteith on August 26, 2014 with complaints of night sweats and unexplained weight loss. (Tr. 519-520.) Physical examination findings were normal, including

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

normal motor strength, sensation, reflexes, and gait. (Tr. 520.) Dr. Monteith ordered lab work

and a chest x-ray,[5] and subsequently diagnosed eosinophilia.[6] (Tr. 517.)

On October 6, 2014, Betts returned to Dr. Winkhart with complaints of increased anxiety

and continued memory issues. (Tr. 491-495.) On examination, Dr. Winkhart found Betts was

alert and oriented, friendly, and cooperative, with good eye contact, clear speech, depressed

mood, restricted affect, logical thought process, and good insight/judgment. (Tr. 492-493.) Dr.

Winkhart did not note any deficits in Betts' memory or attention/concentration. (*Id*.) He

continued to assess a GAF of 45, and increased Betts' Zoloft dosage. (Tr. 493-494.)

Betts returned to orthopedist Dr. Taliwal on October 10, 2014 with complaints of

increased low back and bilateral leg pain. (Tr. 408-412.) On examination, Dr. Taliwal noted

that Betts ambulated without difficulty and presented balanced and upright on exam. (Tr. 409.)

Betts demonstrated stiffness and reduced lumbar range of motion, but had 5/5 muscle strength

and normal sensation, reflexes, and pulses. (Tr. 409-410.) Dr. Taliwal found Betts was "healing

well" and referred him to physical therapy with no activity restrictions. (Tr. 410.)

On January 6, 2015, Betts presented to Dr. Deoras for follow up regarding his memory

loss. (Tr. 419-421.) Neurological examination findings were normal. (Tr. 420.) Although Dr.

Deoras reiterated that neuropsychological testing showed pseudo-dementia with medical factors

---

[5] The chest x-ray showed mild chronic lung changes and mild degenerative endplate changes in the thoracic spine. (Tr. 391.)

[6] Eosinophilia is "a higher than normal level of eosinophils. Eosinophils are a type of disease-fighting white blood cell." https://www.mayoclinic.org/symptoms/eosinophilia.

including depression and obstructive sleep apnea, she nonetheless prescribed Aricept[7] and

referred Betts to cognitive rehab, explaining as follows:

> However, he and wife feel that his memory loss is becoming increasingly more concerning. He is forgetting times and dates. He cannot remember appointments. It is becoming a social impairment as he is unable to remember conversational topics that were just said to him a few minutes prior. He has been unable to get employment and as a result of the patient losing his job, he and his wife had to sell their home and move in with their daughter. While he does not endorse any symptoms of depressed mood, wife and pt report apathy and increased lethargy. He is on the zoloft and states that he was seeing a counselor initially. However, he is not seeing her due to too many missed appointments (because he could not remember the appt times). His wife is concerned with this memory loss b/c it is the same type of memory loss that the pt's mother and uncle had.

(Tr. 420.)

The following day, Betts returned to Dr. Monteith for follow up. (Tr. 513-514.) He

indicated his pain was well controlled with medication. (*Id.*) Physical examination findings

were normal. (*Id.*) Dr. Monteith noted that Betts had failed physical therapy/occupational

therapy, and refilled his Percocet. (*Id.*)

On January 26, 2015, Betts was admitted to the hospital after complaining of chest pain

radiating into the left side of his back. (Tr. 431-465.) He underwent an EKG and chest x-ray,

both of which were negative. (Tr. 453.) Betts also underwent a stress test with nuclear imaging,

which revealed mild cardiomegaly, normal ejection fraction, no evidence of ischemia, "good

work capacity," and "sluggish chronotropic response." (Tr. 451.)

On March 17, 2015, Betts presented for speech therapy with Caryn Postlethwait, M.A.,

CCC- SLP. (Tr. 623-627.) He complained of short term memory loss, difficulty learning and

---

[7] Aricept is an acetylcholinesterase inhibitor indicated for treatment of dementia of the Alzheimer's type. *See* www.aricept.com.

remembering new information, and "a lot of difficulty remembering appointment days and times." (Tr. 623.) Cognitive testing performed that date showed mild cognitive deficit, "across all cognitive domains." (Tr. 624.) Ms. Postlethwait recommend skilled speech therapy and a home exercise program. (*Id.*)

On March 18, 2015, Betts returned to social worker Vickie Hanna, LISW, for counseling. (Tr. 496-499.) On examination, Ms. Hanna noted Betts was well groomed and cooperative with average demeanor and eye contact. (*Id.*) She also noted clear speech, average activity, depressed mood, full affect, logical thought process, "mild to moderate memory deficits," and fair insight and judgment. (Tr. 496-497.)

On April 1, 2015, Betts reported to Ms. Hanna that "things are going well," and indicated he was doing "all the cooking and cleaning" while staying at a friends' home. (Tr. 500.) On mental status examination, Ms. Hanna noted noted clear speech, average activity, euthymic mood, full affect, logical thought process, "mild to moderate memory deficits," impairment of attention/concentration, and fair insight and judgment. (Tr. 500-501.) Ms. Hanna noted Betts appeared "stable, motivated, and cooperative," and noted his coping strategies included camping, fishing, playing on the computer, watching television, spending time with his grandchildren, and helping care for his friends' two horses. (Tr. 502.)

Several weeks later, on April 14, 2015, Betts returned to Dr. Deoras. (Tr. 609-610.) He indicated his memory loss was "slightly worse." (*Id.*) Examination findings were normal. (*Id.*) Dr. Deoras increased his Aricept dosage. (Tr. 609.) Betts presented to Dr. Monteith the following day with complaints of depression and low back pain. (Tr. 510-511.) Physical

examination findings were normal.  (Tr. 511.)  Dr. Monteith increased Betts' Zoloft dosage.  (*Id.*)

Betts returned to speech therapy on May 19, 2015.  (Tr. 629-633.)  Ms. Postlethwait indicated Betts presented "with brighter affect and better overall eye contact and non-verbal interaction . . . than noted during previous contact."  (Tr. 630.)  She did note, however, that Betts was "depending on his wife quite a bit to assist him in recalling info."  (*Id.*)  Betts was "not able to give specific example of memory concern he encounters in his daily life currently," but Ms. Postlethwait encouraged him to continue to use "memory compensatory" strategies.  (Tr. 630-631.)  The following month, Ms. Postlethwait noted that Betts was "appearing to make some good progress towards his goals," and noted his successful use of a memory log.  (Tr. 635.)

On May 26, 2015, Betts returned to Ms. Hanna for counseling.  (Tr. 596-598.)  On mental status examination, Ms. Hanna noted average demeanor, cooperative behavior, average eye contact, clear speech, average activity, euthymic mood, full affect, logical thought process, "mild to moderate memory deficits," impairment of attention/concentration, and fair insight and judgment.  (Tr. 596-597.)  Ms. Hanna described Betts as stable, pleasant, and cheerful.  (Tr. 597.)

On June 11, 2015, Betts presented to Dr. Monteith with complaints of chronic lower back pain radiating down his legs.  (Tr. 551-552.)  Physical examination findings were normal.  (*Id.*)  Dr. Monteith found Betts' pain was "uncontrolled" and increased his Percocet dosage.  (Tr. 553.)

Later that month, Betts returned for speech therapy with Ms. Postlethwait.  (Tr. 637-639.)  She found he "appears to be making fair to good changes and adaptions to improve his memory and recall in his daily life," including use of a memory log and calendar.  (Tr. 638.)  Ms.

Postlethwait also indicated Betts was "reporting increased independence, less dependence on his wife for memory/recall support." (*Id.*)

On June 23, 2015, Betts presented to Ms. Hanna for counseling. (Tr. 599-601.) He reported "I'm in good spirits. . . speech therapy is going well- she's teaching me how to organize things and write things down." (Tr. 599.) On mental status examination, Ms. Hanna noted average demeanor, cooperative behavior, average eye contact, clear speech, average activity, euthymic mood, full affect, concrete thought process, "mild to moderate memory deficits," impairment of attention/concentration, and fair insight and judgment. (Tr. 599-600.) She found he was "stable and functioning well on a daily basis," and noted his "mood/functioning has improved significantly . . . estimated 50% improvement." (Tr. 601.)

Later that month, Betts returned to Dr. Deoras with complaints of continued memory loss and difficulty remembering tasks and maintaining attention and focus. (Tr. 607-609.) Examination findings were normal. (Tr. 608.) Dr. Deoras diagnosed dementia, depression, and obstructive sleep apnea; and prescribed low dose Namenda, in addition to Aricept. (Tr. 607.)

Betts returned to Dr. Monteith on September 1, 2015 with complaints of depression and anxiety. (Tr. 687-689.) He indicated his low back pain was "better" and his pain symptoms were controlled. (Tr. 687.) Physical examination findings were normal. (Tr. 688.) Dr. Monteith ordered blood work and continued Betts on his medication. (Tr. 688-689.)

On September 11, 2015, Dr. Deoras increased Betts' Namenda dosage and advised him to continue cognitive rehab. (Tr. 648.)

On December 7, 2015, Betts reported to Dr. Monteith with complaints of worsening dementia. (Tr. 667-668.) Dr. Monteith assessed dementia and major depressive disorder; and

adjusted Betts' medications, switching him from Zoloft to Lexapro. (Tr. 669.) On that same date, Dr. Monteith completed a form for the Portage Department of Job & Family Services regarding Betts' physical and mental functional limitations. (Tr. 719.) Therein, Dr. Monteith concluded Betts could lift 10 to 20 pounds; stand/walk for 6 ½ to 8 hours per workday; and sit for 6 ½ to 8 hours per workday. (*Id*.) He further concluded Betts was not able to (1) remember work locations/procedures; (2) maintain attention/concentration; (3) sustain an ordinary routine; (4) carry out instructions; or (5) perform activities within a schedule. (*Id.*)

On February 1, 2016, Betts complained to Dr. Monteith of continuing depression. (Tr. 758-760.) He assessed major depressive disorder, dementia, and obstructive sleep apnea; and increased Betts' Lexapro dosage. (Tr. 760.)

Six months later, on August 4, 2016, Betts reported increased depression, stating he "feels sad often" and "does not want to get out bed" in the morning. (Tr. 821-823.) He indicated he had little interest or pleasure in doing things and felt down, depressed or hopeless nearly every day. (Tr. 821.) Betts reported, however, that he did not have trouble concentrating on things such as reading the newspaper or watching television. (*Id*.) With regard to his memory loss, Betts stated his dementia and short term memory were worsening. (*Id*.) As examples, he indicated he was forgetting to take medications and had gotten lost of multiple occasions when driving. (*Id*.) Dr. Monteith assessed major depressive disorder and early onset Alzheimer's disease. (Tr. 823.) He prescribed Bupropion and Namzaric. (*Id*.)

The following month, Betts reported chronic pain, which he rated an 8 on a scale of 10. (Tr. 805-806.) Physical examination findings were normal. (Tr. 807.) Dr. Monteith assessed chronic pain syndrome and dementia, and continued Betts on his medications. (*Id.*)

On October 21, 2016, Betts returned to Dr. Deoras. (Tr. 763-764.) With regard to Betts' Alzheimer's, Dr. Deoras stated as follows:

> Still having difficulty remembering names, routes. Is able to do all [activities of daily living] on his own currently. Recently switched to namzaric and tolerating without difficulty. Encouraged continued cognitive stimulation with word games/puzzles/etc. Recommended against driving at this point (as wife reports pt gets easily distracted, slower reaction timing, and gets lost frequently) and working (as safety issue to both patient and coworkers).

(Tr. 763.) She continued him on his medications; i.e., Namzaric, Lexapro, and Wellbutrin. (*Id.*)

On December 28, 2016, Betts presented to Dr. Monteith. (Tr. 790-793.) He again reported no difficulty concentrating on things such as reading the newspaper or watching television. (Tr. 790, 856.)

On January 19, 2017, Dr. Monteith authored a letter regarding Betts' condition and limitations. (Tr. 855.) This letter states, in its entirety, as follows:

> I have had the pleasure of being the primary care physician for Mr. Franklin Betts since May of 2013. He has a history of early onset dementia which was diagnosed by his neurologist Dr. Mita Deoras. He has previously undergone neurologic imaging and neuropsychiatric testing. He is currently being medically managed with Nanzric. Given his dementia he is unsafe to drive secondary to short term memory limitations and delay reaction time. Due to his early onset dementia and short term memory issues it is my recommendation that he is unable and unsafe to work. If you have any questions, please do not hesitate to call my office.

(Tr. 855.)

On March 29, 2017, Betts returned to Dr. Monteith for follow up. (Tr. 775-778.) Physical examination findings were normal. (Tr. 777.) During this visit, Betts underwent a "Mini-Mental Status Exam" ("MMSE"), which tested his cognition and higher cerebral

function.  (*Id.*)  Dr. Monteith recorded a MMSE score of 24, which suggests mild dementia.[8]  (*Id.*)  Betts was continued on his medications, and prescribed Trazodone.  (*Id.*)

Betts returned to Dr. Monteith on April 26, 2017.  (Tr. 865-868.)  He complained of a continued "slow decline" in his memory, indicating he forgets to bathe and eat at times.  (Tr. 865.)  Betts also reported a decline in his ability to independently perform his activities of daily living, perform complex tasks, and choose proper clothing to wear.[9]  (*Id.*)  Betts underwent an MMSE during this visit, at which he appeared to score a 7.[10]  (Tr. 867.)  Dr. Monteith continued him on his medications.  (*Id.*)

C.      **State Agency Reports**

1.      **Mental Impairments**

On May 22, 2015, state agency psychologist Cynthia Waggoner, Psy.D., reviewed Betts' medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 85-86, 89-91.)  In the PRT, Dr. Waggoner found

---

[8] "The maximum MMSE score is 30 points.  A score of 20 to 24 suggests mild dementia, 13 to 20 suggests moderate dementia, and less than 12 indicates severe dementia."  *See* https://www.alz.org/alzheimers-dementia/diagnosis/medicaltests.

[9] Betts states that these findings indicate he has "Stage 5" dementia, which he claims indicates "a moderately severe decline where the person may begin to need help with many day-to-day activities, including dressing appropriately, inability to recall simple details about themselves, and significant confusion." (Doc. No. 13 at 18, fn 6.)  It is not clear from Dr. Monteith's treatment note, however, that he diagnosed Stage 5 dementia or otherwise formally characterized Betts' dementia in terms of the degree of its severity.

[10] Dr. Monteith's treatment note is somewhat confusing on this issue.  It first appears to state that Betts' score on the Mini-Mental Exam was "normal" but then records an MMSE score 7, which (according to the Alzheimer's Association) is suggestive of severe dementia.  The parties interpret these scores differently in their Briefs.

Betts was mildly limited in his activities of daily living, and moderately limited in his abilities to maintain social functioning and maintain concentration, persistence or pace.  (Tr. 86.)

In the Mental RFC Assessment, Dr. Waggoner concluded Betts was moderately limited in his abilities to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) respond appropriately to changes in the work place.  (Tr. 89-90.)  In the narrative section of the report, Dr. Waggoner explained that Betts can perform simple repetitive 1 to 2 step tasks, maintain attention, make simple decisions, and adequately adhere to a schedule, but would need some flexibility in terms of time limits and production standards.  (Tr. 89-90.)  She further found Betts could perform work with no strict time or production quotas in a relatively stable environment, and that he would benefit from supportive supervision when first learning a task and explanation of changes in routine.  (*Id.*)

On October 7, 2015, state agency psychologist Patricia Kirwin, Ph.D., reviewed Betts' records and completed a PRT and Mental RFC Assessment.  (Tr. 114, 117-119.)  Dr. Kirwin reached the same conclusions as Dr. Waggoner.  (*Id.*)

### 2. Physical Impairments

On May 19, 2015, state agency physician Diane Manos, M.D., reviewed Betts' medical records and completed a Physical RFC Assessment.  (Tr. 87-88.)  Dr. Manos found Betts could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  She

concluded he had an unlimited capacity to push/pull and balance, and could frequently stoop, kneel, crouch, crawl and climb ramps/stairs. (*Id*.) Lastly, Dr. Manos found Betts could occasionally climb ladders, ropes, and scaffolds. (*Id*.)

On September 30, 2015, state agency physician William Bolz, M.D., reviewed Betts' medical records and completed a Physical RFC Assessment. (Tr. 115-117.) He reached the same conclusions as Dr. Manos. (*Id*.)

**D.     Hearing Testimony**

During the May 9, 2017 hearing, Betts testified to the following:

- He graduated from high school, and had some vocational training in auto mechanics. (Tr. 53.) He is married and lives with his spouse and some friends. (Tr. 51.) He used to have a drivers license but he forgot to renew it, and now it is suspended. (Tr. 52.) His wife drives him where he needs to go. (Tr. 53.)

- He worked for 13 years at a Rubbermaid factory as a material technician, extruder operator, and grinder. (Tr. 53-54.) In the beginning, he performed one of these positions at any one time, but eventually he performed all three at the same time. (*Id*.) In each of these positions, he was on his feet all day, lifted anywhere between 50 and 200 pounds, and drove a tow motor. (Tr. 54-57.) He was fired on January 22, 2014 for using a cell phone while he was seated in a tow motor. (Tr. 53, 60.)

- In 2013, he fell down a flight of stairs and injured both his head and his back. (Tr. 59.) He sustained a compression fracture in his back, and missed three months of work. (Tr. 58-59.) He started forgetting things on the job. (Tr. 61.) His memory worsened after he was fired, and he went to a neurologist. (Tr. 61-62.) At first, his doctor thought his memory problems were caused by his sleep apnea. (*Id*.) After further testing, his doctor determined he had early onset Alzheimer's. (*Id*.) He currently takes Namzaric for this condition. (Tr. 62.)

- He went to cognitive therapy for six months to a year to help him with his memory problems. (Tr. 62-63.) He also received counseling for depression and anxiety, but was discharged from therapy after showing improvement. (Tr. 69-70.) He takes Trazodone for sleeping problems, and Percocet for his back pain. (Tr. 63, 70.)

- He can no longer work because he has difficulty focusing and concentrating. (Tr. 58.) He gets distracted easily, and forgets things. (Tr. 58, 61.) He also gets nervous around large crowds. (Tr. 58.)

- On a typical day, he wakes up and has coffee, and his wife reminds him to take the dogs out and feed them. (Tr. 63.) His wife helps with the cooking because he almost burned the house down when he accidentally left the stove on. (*Id.*) He plays puzzle and word games to help improve his memory. (*Id.*) He watches television, and sometimes walks the dogs. (Tr. 64-65.) He spends time with his family, and plays games with his many grandchildren. (Tr. 65-66.) Sometimes he goes to the grocery store. (Tr. 66.) His wife helps him or reminds him to bathe, dress, and take his medications. (Tr. 67.)

- For awhile, he and his wife were taking care of a friend with cancer. (Tr. 64.) At that time, he helped with the cooking, laundry, and care of her horses. (*Id.*) He could not remember how long he and his wife lived with and cared for their friend. (*Id.*)

- When he was still driving, he started getting lost and forgetting where places were. (Tr. 66.) He was in three fender benders in a six month period. (Tr. 67.)

- When too many family members come over, he excuses himself and goes to his room for awhile. (Tr. 68.) He feels anxious in crowds. (*Id.*) He spends most of his time in his room. (Tr. 69.) He started feeling depressed when he lost his job. (*Id.*)

The VE testified Betts had past work (both individually and as a composite job) as a material handler (semi-skilled, SVP 3, heavy performed as very heavy); extruder operator (skilled, SVP 5, medium performed as heavy/very heavy); and grinder (unskilled, SVP 2, heavy performed as very heavy). (Tr. 72-73.) The VE explained the composite position was classified as skilled, SVP 5, performed at the very heavy exertional level. (Tr. 73.) The ALJ then posed the following hypothetical question:

Assume a hypothetical individual of the Claimant's age and education with the past job that you described. Further assume this individual can perform medium work,[11]

---

[11] "Medium work" is defined as follows: "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If

can frequently climb ramps and stairs, and occasionally climb ladders, ropes and scaffolds, can frequently stoop, kneel, crouch, and crawl. The individual can perform simple, routine, repetitive tasks, but not at a fast production rate pace. The individual should work in an environment with few changes, with changes explained. And the individual can make simple decisions. Could the hypothetical individual perform the past job you described as actually performed or generally performed in the national economy?

(Tr. 74.)

The VE testified the hypothetical individual would not be able to perform Betts' past work as material handler, extruder operator, or grinder; but would be able to perform other representative jobs in the economy such as laundry worker II (unskilled, SVP 2, medium); cleaner, industrial (unskilled, SVP 2, medium); and cleaner, laboratory equipment (unskilled, SVP 2, medium). (Tr. 74-75.)

The ALJ then asked a second hypothetical that was the same as the first except that the hypothetical individual could perform light work.[12] (Tr. 75-76.) The VE testified the

_____

someone can do medium work, we determine he or she can also do sedentary and light work." 20 CFR § 404.1567(c). Social Security Ruling 83–10 clarifies that "a full range of medium work requires standing and walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting and carrying objects weighing up to 25 pounds." SSR 83–10, 1983 WL 31251 (1983).

[12] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

hypothetical individual could perform the jobs of cashier II (unskilled, SVP 2, light); cleaner housekeeper (unskilled, SVP 2, light); and sales attendant (unskilled, SVP 2, light). (Tr. 76.)

Finally, the ALJ asked the VE regarding employer tolerance for absences and off-task behavior. (Tr. 76.) With regard to absences, the VE testified that "once an individual reaches the point where they're going to be absent more than one day per month on a regular basis there would be no work." (Tr. 77.) With regard to off task behavior, the VE testified there would be no work for an individual that is off task 15% or more of the workday. (Tr. 76.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Betts was insured on his alleged disability onset date, January 22, 2014, and remained insured through September 30, 2019, his date last insured ("DLI.") (Tr. 28.) Therefore, in order to be entitled to POD and DIB, Betts must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since January 22, 2014, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3. The claimant has the following severe impairments: chronic stable L2 compression fracture, depression, anxiety, and pseudo dementia/early onset Alzheimer's disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently climb ramps and stairs.  He can occasionally climb ladders, ropes, or scaffolds.  The claimant can frequently stoop, kneel, crouch, and crawl.  He can perform simple, routine, and repetitive tasks but not at a production rate pace.  He should work in an environment with few changes where changes are explained.  The claimant can make simple decisions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February ** 1967 and was 46 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964.)

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 22, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 28-37.)

# V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### *Listing 12.02*

Betts argues the ALJ erred in determining he did not meet the requirements of Listing 12.02 for Neurocognitive Disorders. (Doc. No. 13 at 16-19.) Relying principally on treatment records from Drs. Deoras and Monteith, Betts argues he had marked limitations in all four of the Paragraph B Criteria for this Listing; i.e., (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing himself. (*Id*. at 18.) He complains the "ALJ failed to discuss Listing 12.02 except as a composite with Listings 12.02 and 12.06," and argues she inappropriately based her findings on early treatment notes and a Function Report filed at the time of his application. (*Id*.) Betts maintains the ALJ "did not discuss the effects of [his] cognitive impairments except as a generic evaluation with his other psychiatric impairments" and, further, "failed to fully consider the effects of [his] dementia/Alzheimer's on his ability to sustain any work activity." (*Id*.)

The Commissioner argues the ALJ's analysis of Listing 12.02 is supported by substantial evidence. (Doc. No. 15 at 14-17.) She maintains "[i]t is unclear how Plaintiff argues that he satisfied the A, B, or C criteria of Listing 12.02, and there is simply no objective evidence that he did so." (*Id.* at 15.) The Commissioner also asserts the ALJ's Listing analysis is supported by the fact that no medical source opined that he met or equaled any listing. (*Id.* at 16.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for

listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, 2017 WL 4216585 at * 5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 Fed. Appx. at 416); *Joseph v. Comm'r of Soc. Sec.*, 2018 WL 3414141 at * 4 (6th Cir. July 13, 2018) (same). *See also Snyder v. Comm'r of Soc. Sec.*, 2014 WL 6687227 at * 10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 2013 WL 4710516 at *10 (N.D. Ohio Aug.29, 2013).

Here, Betts argues the ALJ erred in finding he did not meet the requirements of Listing 12.02. That Listing defines Neurocognitive disorders as follows:

**1. Neurocognitive disorders (12.02).**

a. These disorders are characterized by a clinically significant decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards.

b. Examples of disorders that we evaluate in this category include major neurocognitive disorder; dementia of the Alzheimer type; vascular dementia; dementia due to a medical condition such as a metabolic disease (for example,

late-onset Tay–Sachs disease), human immunodeficiency virus infection, vascular malformation, progressive brain tumor, neurological disease (for example, multiple sclerosis, Parkinsonian syndrome, Huntington disease), or traumatic brain injury; or substance-induced cognitive disorder associated with drugs of abuse, medications, or toxins. (We evaluate neurological disorders under that body system (see 11.00). We evaluate cognitive impairments that result from neurological disorders under 12.02 if they do not satisfy the requirements in 11.00 (see 11.00G).)

20 CFR Part 404, Subpart P, Appendix 1, at Listing 12.00B1. To satisfy the requirements of Listing 12.02, a claimant must have a neurocognitive disorder as described above and the following:

A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:

1. Complex attention;

2. Executive function;

3. Learning and memory;

4. Language;

5. Perceptual-motor; or

6. Social cognition.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

OR

29

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.02. To meet Listing 12.02, a claimant must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. *See* 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00A2; Listing 12.02.

The record reflects Betts argued that he met the requirements of Listing 12.02 in his administrative briefing before the ALJ. (Tr. 330.) At step two, the ALJ found that Betts' pseudo dementia/early onset Alzheimer's disease constituted a severe impairment. (Tr. 30.) At step three, the ALJ expressly stated that she considered Listing 12.02 and addressed the paragraph B and C criteria for that Listing as follows:

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has moderate limitations. The claimant displayed impaired memory at exams, but such impairment

appeared to be largely mild. He was able to watch television, without apparent problems understanding the programming (6E/3). He was also able to play cards and computer games (6E/7; 9F/36). Additionally, the claimant appeared to be capable of understanding and following medical advice.

In interacting with others, the claimant has moderate limitations. The claimant said that he struggled to get out of bed at times. Nevertheless, he went to church and he went shopping (6E/3, 5). He interacted with others regularly and he did not appear to have any substantial ongoing discord in his marriage. Moreover, the claimant stated that he got along adequately with authority figures (6E/8). Indeed, he had normal behavior at the balance of his exams.

With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitations. At several mental health exams, the claimant had impaired memory with occasionally impaired concentration. However, he had the requisite attention to play cards and computer games (6E/7; 9F/36). He was also able to watch television programs without apparent difficulty (6E/3). Finally, the claimant was able to follow the proceedings at the hearing and answer questions appropriately.

As for adapting or managing oneself, the claimant has experienced mild limitations. Although the claimant asserted that he struggled to get out of bed at times and he required reminders from his wife, he went shopping and prepared simple meals (6E/4, 5). He cleaned and did laundry (6E/4). The claimant provided care for pets and he attended church (6E/3). Moreover, he did not display any ongoing problems with maintaining his grooming or hygiene.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant was able to tend to his daily activities without apparent significant problems. Moreover, the evidence did not establish marginal adjustment.

(Tr. 31-32.) Later, at step four, the ALJ discussed the medical and opinion evidence regarding Betts' memory and concentration impairments at some length. (Tr. 33-36.) She concluded as follows:

In terms of the claimant's mental conditions, he had memory and concentration impairments, with ongoing depression during the relevant period. Nevertheless, his objective cognitive deficits appeared to be largely modest and he improved with treatment. Despite his impaired memory, his physician said that the claimant was

31

independent in all daily activities (15F/2). Furthermore, he displayed generally normal behavior and thoughts, indicating that he could perform simple, routine tasks in an environment described in the residual functional capacity.

(Tr. 36.)

The Court finds substantial evidence supports the ALJ's determination that Betts does not meet the requirements of Listing 12.02. With regard to the paragraph B criteria,[13] the ALJ first concluded Betts had a moderate limitation in the category of understanding, remembering, or applying information[14] because (1) his memory impairment was largely recorded as mild during examinations; and (2) he was able to watch and follow television programs, play cards and computer games, and was capable of understanding and following medical advice. (Tr. 31.) As discussed below, these reasons are supported by substantial evidence.

Treatment records generally recorded mild to moderate memory deficits, logical thought process, and good insight and judgment. (Tr. 479, 487, 496-497, 500-502, 597, 600.) Cognitive testing conducted by speech therapist Ms. Postlethwait in March 2015 showed "mild cognitive deficit across all cognitive domains." (Tr. 624.) Moreover, and as the ALJ stated later in the decision, Ms. Postlethwait noted improvement with cognitive therapy in June 2015, finding Betts was "functioning well on a daily basis" with "increased independence" and 50%

---

[13] Because the ALJ found Betts did not meet the requirements of either Paragraphs B or C, the decision did not address the Paragraph A criteria of Listing 12.02.

[14] The regulations define this category as follows: " This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." Listing 12.00E1.

improvement with therapy. (Tr. 601.) Over a year later, in August 2016, Betts reported he did not have trouble concentrating on things such as reading the newspaper or watching television. (Tr. 821.) In March 2017, cognitive testing was noted as "normal" and Dr. Monteith recorded an MMSE score of 24, which suggests mild dementia. (Tr. 777.) Lastly, during the May 2017 hearing, Betts testified he watches television, and plays puzzle and word games. (Tr. 63-65.) He did not testify that he had any difficulty performing these activities, nor did he demonstrate significant difficulty understanding and answering the ALJ's questions during the hearing.

Betts argues, however, that remand is required because the ALJ failed to acknowledge Dr. Monteith's treatment note from April 2017, in which Betts complained of a significant deterioration in his ability to perform daily activities and complex tasks. (Tr. 865.) Betts also argues that, in this treatment note, Dr. Monteith assessed "Stage 5" dementia and found a significant decline in functioning on cognitive testing. (*Id*.) Even assuming this to be the case,[15] it is well established that this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's determination. *See e.g., Abbott*, 905 F.2d at 922. If substantial evidence supports the ALJ's determination that Plaintiff's impairments did not meet or medically equal Listing 12.02, this Court cannot reverse that determination, even if substantial evidence exists to the contrary. Here, for all the reasons set forth above, the Court finds substantial evidence supports the ALJ's determination that Betts had moderate (as opposed to marked) limitations in the category of understanding, remembering, and applying information.

---

[15] As noted *supra*, Dr. Monteith's April 2017 treatment note is unclear. It first appears to state that Betts' score on the Mini-Mental Exam was "normal" but then records an MMSE score 7, which Betts argues is suggestive of severe dementia. (Tr. 865.)

The ALJ next concluded that Betts had moderate limitations in the category of interacting with others[16] because he went to church, went shopping, interacted with others regularly, did not have substantial ongoing discord in his marriage, and showed normal behavior at his examinations.  (Tr. 31-32.)  These reasons are supported by substantial evidence. In a May 2015 Function Report, Betts reported that he went to church, grocery shopped, lived with friends, and spent time with people by "talking and playing cards." (Tr. 284-290.)  In that same report, he indicated he got along "okay" with authority figures and had never been fired or laid off from a job because of problems getting along with people.  (Tr. 290.)  During the May 2017 hearing, Betts testified he spent time with family, played games with his many grandchildren, and went grocery shopping.  (Tr. 65-66.)  Finally, Betts was often described in treatment records as friendly, cheerful, pleasant, and cooperative with medical professionals. (Tr. 597, 599, 478-479, 487, 492, 496-498, 502.)  Based on the above, the Court finds substantial evidence supports the ALJ's finding of moderate limitations in the category of interacting with others.

The ALJ next concluded Betts had moderate limitations in the category of concentrating, persisting, or maintaining pace[17] because he was able to play cards, computer

---

[16] The regulations define this category as follows: "This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." Listing 12.00E2.

[17] The regulations define this category as follows: "This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained

games, watch television without apparent difficulty, and follow proceedings at the hearing and answer questions appropriately. (Tr. 32.) Later in the decision, the ALJ also noted the many normal mental status examination findings in the record (including logical thought process and intact concentration) and found Betts' objective cognitive deficits were modest and improved with treatment. (Tr. 33-36.) These reasons are supported by substantial evidence for the reasons set forth below.

While treatment records sometimes noted concentration deficits (*e.g.*, Tr. 477), the record also reflects numerous occasions where Betts' concentration was found to be intact. For example, in July and October 2014, Dr. Winkhart did not note any concentration deficits. (Tr. 487, 492.) In March 2015, speech therapist Ms. Postlethwait found only mild cognitive deficits across all cognitive domains. (Tr. 624.) The following month, Betts reported to counselor Ms. Hanna that he was able to watch television, play games on the computer, and take care of his friends' two horses. (Tr. 502.) In June 2015, Betts was "functioning well on a daily basis" with 50% improvement with therapy. (Tr. 601.) Over a year later, in August 2016, Betts reported he did not have trouble concentrating on things such as reading the paper or watching television. (Tr. 821.) Further, during the May 2017 hearing, Betts testified he watches television, and plays puzzle and word games. (Tr. 63-65.) He did not testify that he had any difficulty performing these activities, nor did he demonstrate significant difficulty understanding and

---

rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." Listing 12.00E3.

answering the ALJ's questions during the hearing.  Based on the above, the Court finds substantial evidence supports the ALJ's finding of moderate limitations in the category of concentrating, persisting, or maintaining pace.

With regard to the fourth (and final) paragraph B criteria, the ALJ found Betts had mild limitations in the area of adapting or managing onself[18] because he went shopping, prepared simple meals, cleaned and did laundry, attended church, cared for pets, and "did not display any ongoing problems with maintaining his grooming or hygiene." (Tr. 32.)  These reasons are supported by substantial evidence.  As noted above, in May 2015, Betts reported he did not have problems with personal care (such as bathing, feeding himself, toileting, etc.) and could prepare simple meals.  (Tr. 285-286.)  He also stated he cared for pets, went grocery shopping, did some cleaning and laundry, and attended church.  (Tr. 285-287.)  During the hearing, Betts testified he goes grocery shopping and had helped care for a friend with cancer by cooking, doing the laundry, and caring for his friend's horses.  (Tr. 64, 66.)  Finally, treatment records reflect Betts was consistently described as well groomed.  (Tr. 496, 500, 596, 599.)  While the Court acknowledges there is evidence of Betts' complaints of a deterioration in his ability to care for himself and perform tasks, the Court finds the above cited evidence constitutes substantial evidence in support of the ALJ's finding of moderate limitations in the category of adapting or managing onself.

---

[18] The regulations define this category as follows: "This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions."  Listing 12.00E4.

Finally, the ALJ concluded the paragraph C criteria were not met because Betts was "able to tend to his daily activities without apparent significant problems" and "the evidence did not establish marginal adjustment." (Tr. 32.) This reason is supported by substantial evidence. In May 2014, Betts reported he was able to perform his activities of daily living independently. (Tr. 478.) In April 2015, he indicated he was doing all the cooking and cleaning at his friends' home, as well as caring for her pet horses. (Tr. 500, 502.) As noted above, in May 2015, Betts reported he did not have problems with personal care (such as bathing, feeding himself, toileting, etc.) and could prepare simple meals. ( Tr. 285-286.) He also stated he cared for pets, went grocery shopping, did some cleaning and laundry, and attended church. (Tr. 285-287.) In June 2015, speech therapist Ms. Postlethwait found Betts was "functioning well on a daily basis" with 50% improvement with therapy. (Tr. 601.) Finally, during the hearing, Betts testified he goes grocery shopping and had helped care for a friend with cancer by cooking, doing the laundry, and caring for his friend's horses. (Tr. 64, 66.) The Court finds the above evidence constitutes substantial evidence in support of the ALJ's finding that Betts does not satisfy the paragraph C criteria.

Lastly, the Court rejects Betts' argument that remand is required because the ALJ conducted a "generic evaluation with his other psychiatric impairments" and failed to separately address Listing 12.02. As another district court within this Circuit has explained, "[i]Inasmuch as the criteria for meeting Listing 12.02(B) is the same as that required for 12.04, 12.06, and 12.08(B) and 12.05(D), the ALJ's analysis adequately addresses the requirements for each of the Listings noted." *Rivers v. Comm'r of Soc. Sec.*, 2018 WL 4610874 at * 6 (E.D. Mich. Aug. 29, 2018), *report and recommendation adopted at*, 2018 WL 4600233 (E.D. Mich. Sept. 25, 2018).

*See also Suesz v. Comm'r of Soc. Sec.*, 2014 WL 4162555 at *5 (S.D. Ohio Aug. 20, 2014)

("While the ALJ did not expressly analyze whether Plaintiff met Listing 12.02, he did provide a

thorough analysis of the severity requirements of Listing 12.04. In so doing, the ALJ

determined that Plaintiff's impairment did not satisfy the criteria in paragraph B or paragraph

C," which are substantially identical).

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly

determined Betts did not satisfy the requirements of Listing 12.02.

### Treating Physicians Drs. Monteith and Deoras

Betts next argues the ALJ failed to properly consider the opinions of treating

physicians Drs. Monteith and Deoras that Betts should not drive and should not work due to his

short-term memory issues and delayed reaction times. (Doc. No. 13 at 11-16.) He argues that ,

in assigning these opinions little weight, the ALJ failed acknowledge evidence that his

"condition was deteriorating[19] and that at the time of the hearing he was having difficulty

performing his activities of daily living." (*Id*. at 13.) Betts further asserts the ALJ "played

doctor," cherry picked the evidence, and "disregarded any opinions and/or evidence

documenting Betts' dementia and/or Alzheimer's." (*Id.* at 15.) Lastly, Betts maintains the ALJ

erred in according little weight to the GAF scores assessed by Dr. Winkhart. (*Id*. at 12.)

---

[19] In support of this argument, Betts relies, in part, on evidence submitted to the Appeals
Council. (Doc. No. 13 at 12.) However, as the Appeals Council denied review, this
Court's review is limited to the record and evidence before the ALJ. *See Miller v.
Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016); *Foster v. Halter*, 279 F.3d 348,
357 (6th Cir.2001); *Walker v. Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich.2003); *Fink
v. Comm'r of Soc. Sec.*, 2013 WL 3336579 at fn 5 (N.D. Ohio June 25, 2013). Thus, the
Court will not recount or consider this additional medical evidence.

The Commissioner argues the ALJ's evaluation of the opinions of Drs. Monteith and Deoras is supported by substantial evidence. (Doc. No. 15 at 7-14.) She asserts the ALJ properly discounted these opinions on the basis that they were inconsistent with the record and constituted conclusory statements on issues reserved to the Commissioner. (*Id*. at 9.) The Commissioner argues the evidence cited by Betts regarding his alleged deterioration is based on his and his wife's "subjective recitations of Plaintiff's mental health symptoms." (*Id*. at 10.) She maintains objective psychological examination findings showed only mild memory restrictions and treatment records indicated Betts was largely able to perform his daily living activities independently. (*Id*. at 11.) The Commissioner also argues the ALJ properly discounted Dr. Winkhart's GAF scores. (*Id.* at 13.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[20] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[21] Indeed,

---

[20] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017). As Betts filed his applications in January 2015, the Court will apply the regulations in effect at that time.

[21] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

"[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[22] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378

---

[22] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, on October 21, 2016, Dr. Deoras examined Betts and noted as follows: "Still having difficulty remembering names, routes.  Is able to do all [activities of daily living] on his own currently.  Recently switched to namzaric and tolerating without difficulty.  Encouraged continued cognitive stimulation with word games/puzzles/etc.  **Recommended against driving at this point (as wife reports pt gets easily distracted, slower reaction timing, and gets lost frequently) and working (as safety issue to both patient and coworkers).**"  (Tr. 763) (emphasis added).

Dr. Monteith authored a letter on January 19, 2017 regarding Betts' condition and limitations.  (Tr. 855.)  This letter states, in its entirety, as follows:

> I have had the pleasure of being the primary care physician for Mr. Franklin Betts since May of 2013.  He has a history of early onset dementia which was diagnosed by his neurologist Dr. Mita Deoras.  He has previously undergone neurologic imaging and neuropsychiatric testing.  He is currently being medically managed with Nanzric. **Given his dementia he is unsafe to drive secondary to short term memory limitations and delay reaction time.  Due to his early onset dementia and short term memory issues it is my recommendation that he is unable and unsafe to work**. If you have any questions, please do not hesitate to call my office.

(Tr. 855) (emphasis added).

The ALJ accorded "little weight" to these opinions, as follows:

> The claimant's physician, Jeffrey Montieth, M.D., stated that the claimant's dementia made it unsafe for him to drive and work due to short-term memory restrictions and delayed reaction time (16F/83).  Mita Deoras, M.D., echoed such assessment (15F/2).  The undersigned does not give controlling weight to the opinions of Dr. Montieth and Dr. Deoras.  While they treated the claimant and the record confirms that the claimant had impaired memory, he was able to engage in numerous daily activities independently.  Objective findings showed largely mild memory restrictions, with little indication of significantly delayed reactions.  Additionally, Dr. Montieth and Dr. Deoras did not provide any specific limitations that prevented the claimant from working and such determination is reserved to the Commissioner.  Therefore, the undersigned gives little weight to Dr. Montieth's assessment.

(Tr. 35-36.)

42

The Court finds the ALJ articulated "good reasons" for discounting the opinions of Drs. Monteith and Deoras. The ALJ provided several reasons for discounting these physicians' opinions regarding Betts' abilities to drive and work, including that (1) Betts was able to engage in numerous daily activities independently; (2) objective findings showed largely mild memory issues; and (3) treatment records showed "little indication of significantly delayed reactions." (Tr. 35-36.) These reasons are supported by substantial evidence.

With regard to Betts' daily activities, Betts reported in May 2014 that he was able to perform his activities of daily living independently. (Tr. 478.) In April 2015, he indicated he was doing all the cooking and cleaning at his friends' home, as well as caring for her pet horses. (Tr. 500, 502.) As noted above, in May 2015, Betts reported he did not have problems with personal care (such as bathing, feeding himself, toileting, etc.) and could prepare simple meals. (Tr. 285-286.) He also stated he cared for pets, went grocery shopping, did some cleaning and laundry, and attended church. (Tr. 285-287.) In June 2015, speech therapist Ms. Postlethwait found Betts was "functioning well on a daily basis" with 50% improvement with therapy. (Tr. 601.) In October 2016, Betts continued to report that he was able to do all activities of daily living. (Tr. 763.) Finally, during the hearing, Betts testified he grocery shopped and had helped care for a friend with cancer by cooking, doing the laundry, and caring for his friend's horses. (Tr. 64, 66.)

Substantial evidence also supports the ALJ's findings of largely mild memory impairment. As discussed above, treatment records generally recorded mild to moderate memory deficits, logical thought process, and good insight and judgment. (Tr. 479, 487, 496-497, 500-502, 597, 600.) Cognitive testing conducted by speech therapist Ms. Postlethwait in

43

March 2015 showed "mild cognitive deficit across all cognitive domains." (Tr. 624.) Moreover, and as the ALJ stated later in the decision, Ms. Postlethwait noted improvement with cognitive therapy in June 2015, finding Betts was "functioning well on a daily basis" with "increased independence" and 50% improvement with therapy. (Tr. 601.) Over a year later, in August 2016, Betts reported he did not have trouble concentrating on things such as reading the newspaper or watching television. (Tr. 821.) In March 2017, cognitive testing was noted as "normal" and Dr. Monteith recorded an MMSE score of 24, which suggests mild dementia. (Tr. 777.) Moreover, as the ALJ noted, Betts has not directed to this Court's attention to any treatment records documenting "significantly delayed" reaction time.

Betts argues remand is nonetheless required because the ALJ "played doctor," "cherry picked" the record, and failed to acknowledge evidence that his condition had deteriorated. The Court rejects these arguments. The ALJ thoroughly discussed the medical evidence regarding Betts' dementia/early onset Alzheimer's at step four, including numerous examination findings and test results from throughout the time period at issue. (Tr. 33-35.) In the decision, the ALJ repeatedly acknowledged Betts' complaints of ongoing and worsening memory loss and concentration problems. (*Id*.) Moreover, the ALJ expressly acknowledged Dr. Monteith's April 2017 treatment note documenting a worsening in Betts' mental status test results.[23] (Tr. 35, citing Exhibit 17F/3.) However, viewing the record as a whole, the ALJ found the medical evidence showed that Betts had largely mild memory impairment and retained the ability to perform the majority of his daily living activities independently. The ALJ found the opinions of

---

[23] As has been noted *supra*, the meaning of Dr. Monteith's April 2017 treatment note is not clear.

Drs. Monteith and Deoras to be inconsistent with this evidence. Although there may be some evidence in the record to the contrary, the ALJ's finding is supported by substantial evidence, as discussed at length above.

Finally, Betts argues, summarily, that the ALJ erred in according "little weight" to the GAF scores assessed by Dr. Winkhart. In July and October 2014, Dr. Winkhart assessed a GAF score of 45, indicating serious symptoms. (Tr. 488, 493-494.) Social worker Ms. Hanna assessed GAF scores of 45 in May and June 2014 as well. (Tr. 583-584, 483-484.) Betts maintains these scores should have been accorded greater weight because they "reflected a longitudinal assessment of Betts' functioning during the time period at issue." (Doc. No. 13 at 12-13.)

The ALJ accorded these scores "little weight," as follows: "As for the opinion evidence, the undersigned grants little weight to the GAF scores in the record. They represent only a subjective snapshot assessment of the claimant's mental condition rather than a longitudinal view of his overall mental functioning. Moreover, such scores do not offer specific functional limitations and are thus of limited value in fashioning the residual functional capacity." (Tr. 35.)

A GAF score is a "subjective rating of an individual's overall psychological functioning" which may assist an ALJ in formulating an RFC. *Kennedy v. Astrue,* 247 Fed. Appx 761, 766 (6th Cir. Sept. 7, 2007). The Sixth Circuit has held GAF scores are not "essential to the RFC's accuracy," and directs courts to take a "case-by-case approach to the value of GAF scores." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016). Moreover, while the Sixth Circuit has acknowledged GAF scores may be helpful, an ALJ is not

required to place any "particular amount of weight" on a GAF score.  *See Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx 498, 508 (6th Cir. Oct. 15, 2013).  *See also Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002) (noting that a GAF "is not essential to the RFC's accuracy"); *Keeler v. Comm'r of Soc. Sec.*, 511 Fed. Appx 472, 474 (6th Cir. Jan. 11, 2013) (stating that "the ALJ was not required to consider Keeler's GAF score").  Indeed, the Sixth Circuit has "held that the failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination."  *DeBoard v. Comm'r of Soc. Sec.,* 211 Fed. Appx 411, 415 (citing *Howard*, 276 F.3d at 241).

The Court finds the ALJ did not err in discounting Betts' GAF scores.  As set forth above, the ALJ expressly acknowledged the GAF scores in the record and provided several reasons for assigning them little weight.  (Tr. 35.)  The ALJ's reasons are supported by substantial evidence.  The scores in the record here span a five month period between May and October 2014.  Treatment records reflect that Betts subsequently showed improvement with medication and treatment.  For example, when Betts returned to social worker Ms. Hanna in March 2015, he was "stable, with mild depression, motivated and cooperative."  (Tr. 498.)  The following month, Betts reported "things are going well," and mental status examination showed clear speech, euthymic mood, full affect, and logical thought process.  (Tr. 500-501.)  Ms. Hanna found he was stable, motivated, and cooperative, and that his coping strategies included camping, fishing, spending time with his grandchildren, and caring for his friend's two horses.  (Tr. 502.)  In May 2015, Betts was stable, pleasant, and cheerful.  (Tr. 597.)  In June 2015, he was in "good spirits," and described as "stable and functioning well on a daily basis" with a 50% improvement in mood/functioning.  (Tr. 600.)  In light of the above, the Court finds the

ALJ's finding that the GAF scores represented only a snapshot in time is supported by substantial evidence.

Accordingly, and for the reasons set forth above, the Court finds the ALJ properly evaluated both the opinions of Drs. Monteith and Deoras, and the GAF scores in the record. Betts' arguments to the contrary are without merit.

### Credibility

Betts next argues the ALJ "did not properly evaluate the medical evidence and make a defensible determination as to whether [his] testimony was credible." (Doc. No. 13 at 21-22.) He argues the ALJ improperly "relied on forms completed at the time of the application and early medical records," and failed to consider later treatment records showing deterioration with medication and treatment. (*Id.*) Betts asserts "the ALJ was seeking any justification for a finding that Betts was not disabled, including substituting her own medical judgment for that of the medical evidence in this matter." (*Id.*)

The Commissioner argues the ALJ properly evaluated Betts' credibility. (Doc. No. 15 at 17-19.) She maintains the ALJ discussed many of the factors set forth in the regulations, including Betts' daily activities, medications, subjective complaints, objective medical evidence, and treatment. (*Id.*) The Commissioner further asserts the ALJ properly considered all of the evidence in the record, and did not limit her evaluation to Betts' earlier medical records. (*Id.*)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See e.g, Moore v. Comm'r of Soc. Sec.,* 573 Fed. Appx. 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254

at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[24] 2016 WL 1119029 (March 16, 2016).

     If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record.  The evaluation of a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

     In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other

---

[24]    SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the May 9, 2017 hearing.

relevant evidence on the record.  Beyond medical evidence, there are seven factors that the ALJ should consider.[25]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Betts' complaints of memory loss, impaired concentration, depression, and difficulty completing tasks.  (Tr. 33-34.)  After discussing the medical and opinion evidence at length, the ALJ found Betts' medically determinable impairments could reasonably be expected to cause his alleged symptoms; "however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (Tr. 33.)  Specifically, the ALJ found that Betts' "objective cognitive deficits appeared to be largely modest and he improved with treatment."  (Tr. 36.)  She further explained that "[d]espite his impaired memory, his physician said that the claimant was independent in all daily activities" and "he displayed generally normal behavior and thoughts, indicating that he could perform simple, routine tasks in an environment described in the residual functional capacity."  (*Id.*)

---

[25]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at * 7.

Substantial evidence supports the ALJ's evaluation of Betts' subjective symptoms. As the ALJ correctly noted (and has been addressed above), objective medical evidence from the relevant time period is not consistent with the severity of Betts' subjective complaints of disabling symptoms and limitations relating to his dementia/early onset Alzheimer's. Treatment records generally recorded mild to moderate memory deficits, logical thought process, and good insight and judgment; and cognitive testing showed "mild cognitive deficit across all cognitive domains." (Tr. 479, 487, 496-497, 500-502, 597, 600, 624.) Moreover, speech therapist Ms. Postlethwait noted improvement with cognitive therapy in June 2015, finding Betts was "functioning well on a daily basis" with "increased independence" and 50% improvement with therapy. (Tr. 601.) Over a year later, in August 2016, Betts reported he did not have trouble concentrating on things such as reading the newspaper or watching television. (Tr. 821.) In March 2017, cognitive testing was noted as "normal" and Dr. Monteith recorded an MMSE score of 24, which suggests mild dementia. (Tr. 777.) The ALJ acknowledged that Betts' cognitive testing was "marginally worse" the following month, but noted that he remained on his same treatment regimen. (Tr. 35.)

Substantial evidence also supports the ALJ's finding that Betts was independent in his daily activities. As the ALJ correctly noted earlier in the decision, Betts repeatedly acknowledged that he was able to perform his activities of daily living independently, including personal care, simple meals, cleaning, grocery shopping, and caring for animals. (Tr. 478, 285-287.) In June 2015, he was noted as "functioning well on a daily basis" with 50% improvement with therapy. (Tr. 601.) In October 2016, Betts continued to report that he was able to do all activities of daily living. (Tr. 763.) Finally, during the hearing, Betts testified he grocery

shopped and had helped care for a friend with cancer by cooking, doing the laundry, and caring for his friend's horses.  (Tr. 64, 66.)

The Court also rejects Betts' argument that the ALJ only considered his "earlier medical records" and failed to consider evidence of his deteriorating condition.  The ALJ thoroughly considered the medical evidence in this matter, discussing treatment records spanning the entire time period at issue.  (Tr. 33-35.)  Notably, the ALJ expressly acknowledged Betts' complaints of worsening dementia and increased depression, and specifically discussed Dr. Monteith's April 2017 treatment note documenting a worsening of Betts' mental status testing.  (*Id*.)  Viewing the evidence as a whole, however, the ALJ determined Betts was not limited to the extent suggested by his subjective complaints.  For all the reasons set forth above, the ALJ's analysis is supported by substantial evidence.

While Betts urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec*., 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for her evaluation of Betts' subjective symptoms and supported those reasons with reference to specific evidence in the record.  Betts' argument to the contrary is without merit.

Accordingly, and for all the reasons set forth above, Betts' assignment of error is without merit.

***Hypothetical***

Finally, Betts argues remand is required because the ALJ "relied on a hypothetical question which did not include any of [his] documented memory problems." (Doc. No. 13 at 22-23.) He maintains this error is not harmless because the VE testified that a person who would be off task 15 % or more of a workday would be unable to sustain work activity. (*Id.*) Betts argues that this restriction is supported by his documented memory problems. (*Id.*)

The Commissioner argues Betts has not carried his burden of demonstrating that the hypothetical questions presented to the VE were erroneous. (Doc. No. 15 at 19-20.)

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial

evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."); *Brooks v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 636, 644 (6th Cir. Aug. 6, 2013) ("We have stated on a number of occasions that a hypothetical question posed to a vocational expert must include a 'complete assessment of [the claimant's] physical and mental state and should include an accurate portrayal of her individual physical and mental impairments.'") (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)); *Varley*, 820 F.2d at 779.

The Court finds the ALJ did not err in failing to include limitations relating to off task behavior in the hypothetical questions presented to the VE. As has been discussed exhaustively above, substantial evidence supports the ALJ's finding that Betts' memory and concentration deficits appeared to be largely modest and he improved with treatment. (Tr. 36.) Thus, the ALJ was not required to include in the hypothetical the off task limitation suggested by Betts. The hypothetical question posed to the VE adequately accounted for all of Betts' limitations and was supported by substantial evidence. Betts' arguments to the contrary are without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


                                                 *s/Jonathan D. Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge
Date: April 9, 2019